**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JENNIFER BUSBEY | : | |
| | : | |
| Appellant | : | No. 186 MDA 2019 |

Appeal from the Judgment of Sentence Entered July 24, 2018
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0003011-2017

BEFORE:   DUBOW, J., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED FEBRUARY 21, 2020**

Appellant, Jennifer Busbey, appeals from the judgment of sentence following her jury trial convictions of murder of the third degree, drug delivery resulting in death, delivery of a controlled substance, conspiracy to commit murder of the third degree, conspiracy to commit drug delivery resulting in death, and conspiracy to commit delivery of a controlled substance.[1]   We affirm.

Appellant's convictions relate to the heroin overdose death of Aaron Lawrence ("the victim") during the early morning hours of July 20, 2010.  An arrest warrant was issued for Appellant on April 11, 2017, and her trial took place between May 14 and May 18, 2018.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2502(c) and 2506(a), 35 P.S. § 780-113(a)(30), and 18 Pa.C.S. § 903(a)(1), respectively.

Evidence presented by the Commonwealth at trial demonstrated that Appellant, the victim, and Justin Wentz, Appellant's boyfriend, were each experienced heroin users. N.T., 5/15/18, at 130, 197, 358; N.T., 5/17/18, at 919, 994, 1013. The victim, however, had been released from prison approximately ten days before his death and he had not developed a tolerance to heroin since his release – in other words, he was "narcotics-naive." N.T., 5/15/18, at 130; N.T., 5/16/18, at 499-501. Appellant and Wentz were aware that the victim had recently been released from prison and had a low tolerance. N.T, 5/17/18, at 717, 735, 784-85, 919. On July 19, 2010, Appellant, the victim, and Wentz collected money in order to go to Baltimore to purchase heroin. N.T., 5/15/18, at 360-64; N.T., 5/17/18, at 770, 904, 912, 990-91. The victim remained at Wentz's house in Hanover, Pennsylvania, while Appellant drove Wentz to Baltimore, Maryland. N.T., 5/17/18, at 714-15, 760, 772, 906-08, 991-92. In Baltimore, Wentz purchased three grams of heroin, which Appellant and Wentz understood to be of high quality. *Id.* at 770-72, 785, 916.

Upon returning to Wentz's residence in Hanover in the late evening of July 19th, Wentz divided up the heroin, and Appellant, the victim, and Wentz each used heroin intravenously. *Id.* at 714-18, 777, 913, 993. According to Commonwealth witness Kande Lambertson, Appellant told her during a 2012 conversation that the victim prepared his own dosage, and Appellant injected him, while Wentz injected Appellant and himself. *Id.* at 718, 740-41. Appellant told Lambertson that she watched as the victim "went into

- 2 -

convulsions, and his lips had started turning blue." *Id.* at 716. Appellant further stated that she "wanted to distance herself from the whole issue" and "did not want to be involved" so she left Wentz's house late in the evening on July 19th taking the remainder of the heroin with her. *Id.* According to Wentz, after the victim began to exhibit signs of an overdose, he instructed Appellant to leave with all of the remaining heroin they had purchased and "get rid of it." *Id.* at 919-20, 946-47. Appellant told Lambertson that she and Wentz discussed calling 911 before she left the house but they decided not to call. *Id.* at 718-19, 743.

After Appellant left Wentz's house, she met several individuals and sold some of the heroin and then stashed the remainder behind a shed at her mother's house. *Id.* at 716-17, 779, 781-82. During the hours of 10:53 pm on July 19th and 4:40 am on July 20th, Appellant and Wentz called each other more than 12 times. *Id.* at 812-16. After Appellant's departure, Wentz placed four telephone calls to the victim's phone and texted the victim asking where he was and whether he was in jail in an effort to "separate [him]self" from the victim and make it appear that they were not together. *Id.* at 814-15, 956-57. Wentz also spoke with another friend twice during this period and expressed concern that the victim was non-responsive; the friend advised Wentz to call an ambulance, but Wentz ignored this advice. N.T., 5/15/18, at 367-73. Finally, at 4:42 am on July 20th, Wentz called 911 and reported that an individual at his house had stopped breathing. N.T., 5/15/18, at 167; Commonwealth Ex. 13. When emergency personnel arrived, the victim was

not breathing, had no pulse, and was cool to the touch. N.T., 5/15/18, at 173, 210. The victim was administered the opioid overdose drug Narcan, with no effect. *Id.* at 220

Appellant arrived back at Wentz's house shortly after the emergency personnel. N.T., 5/15/18, at 182. Appellant told Lambertson that when she returned to Wentz's house, "[s]he acted like she had just gotten there, that she had never been there before." N.T., 5/17/18, at 719. According to Officer Clint Miles of the Hanover Borough Police Department, who had responded to the scene, Appellant acted defensively and coldly when informed that the victim had died. N.T., 5/15/18, at 183. Appellant told officers that she had last seen the victim at 7 pm the prior evening and stated that she was not aware that the victim had been using drugs. *Id.* at 185. The only drugs or drug paraphernalia found at Wentz's house were heroin and cocaine residue in baggies inside of a pink and black purse; Appellant admitted that the purse was hers but denied knowledge of the baggies inside. *Id.* at 174-75, 179-80, 183, 223-24, 240.

The Commonwealth presented the testimony of three medical witnesses at trial. Deputy Coroner Claude Stabley, an expert in determining cause and manner of death, testified that the cause of the victim's death was heroin toxicity; he based his opinion on the toxicology report, lack of physical trauma to the victim's body, puncture marks in the victim's right arm near his elbow, drugs found at the scene, and the lack of evidence of any other cause. N.T., 5/15/18, at 253, 258-70. Dr. George Behonick, an expert in forensic

toxicology, testified that the presence of 26.4 nanograms per milliliter of morphine in the victim's blood and 461 nanograms per milliliter of 6-acetylmorphine, a metabolite of heroin, in his urine indicated that the victim had used heroin prior to his death, but he had a long period of survival following the ingestion of the drug. N.T., 5/16/18, at 434, 447-53. Finally, Dr. Wayne Ross, an expert in forensic pathology, testified that the cause of the victim's death was acute morphine toxicity with the source being the ingestion of heroin. *Id.* at 495, 510-12, 518, 581. According to Dr. Ross, the mechanism of death was respiratory depression as the victim's brain eventually stopped informing his lungs to blow out carbon dioxide allowing acidity to build up in his body. *Id.* at 508-09, 515-17. Dr. Ross stated that he had reviewed all of the victim's medical records and determined no other potential cause of death. *Id.* at 497-98, 502-05.

At the conclusion of trial, the trial court instructed the jury that Appellant could be found guilty of murder in the third degree, drug delivery resulting in death, and delivery of a controlled substance as a principal or as an accomplice. N.T., 5/18/18, at 1145-47. The jury found Appellant guilty of all charges on May 18, 2018. On July 24, 2018, the trial court imposed an aggregate sentence of 10 to 20 years of incarceration. Appellant filed a timely

post-sentence motion, which the trial court denied in a memorandum order filed on December 31, 2018. Appellant then filed a timely notice of appeal.[2]

Appellant raises the following issues on appeal:

I. Did the Trial Court err in ruling that the evidence was sufficient to support the verdicts for Third Degree Murder, Drug Delivery Resulting in Death, PWID/Delivery, as well as Conspiracy to Commit Those Offenses?

II. Did the Trial Court err in ruling that the verdicts were not against the weight of the evidence?

III. Did the Trial Court err in permitting Deputy Coroner Stabley to testify regarding toxicology issues where no notice of said testimony was provided to defense, he was not qualified as an expert in toxicology, and said testimony exceeded the scope of his expertise?

IV. Whether the Trial Court erred in precluding defense expert testimony or cross-examination of Commonwealth witnesses regarding prior suicide attempts by the victim, which were documented in stipulated medical records, as evidence of his state of mind at the time of his overdose?

V. Whether the Trial Court erred in instructing the jury it was allowed to infer malice based on [Appellant's] failure to render aid to the victim where no such legal duty existed?

VI. Whether the Trial Court erred in permitting the Commonwealth to introduce bad acts evidence where no notice was provided, no exception to the prohibition existed, the prejudicial value of said testimony far outweighed its probative value, and no limiting instruction was sufficient to cure such prejudice?

Appellant's Brief at 6 (suggested answers omitted).

---

[2] Appellant filed her Pa.R.A.P. 1925(b) statement on February 20, 2019, and the trial court issued a Pa.R.A.P. 1925(a) statement in lieu of opinion on February 26, 2019 relying on its reasons stated in its memorandum order denying Appellant's post-sentence motion.

*Sufficiency of the Evidence*

In her first issue, Appellant argues that the Commonwealth did not present sufficient evidence regarding (1) the malice element of the murder of the third degree and drug delivery resulting in death charges; (2) that Appellant caused the victim's death as required to prove that she committed murder of the third degree and drug delivery resulting in death; (3) the delivery element of the drug delivery resulting in death and delivery of a controlled substance charges; and (4) that she entered into an agreement with Wentz or the victim as required to prove that she committed the three conspiracy offenses.

Before reaching the merits of this issue, we must address the Commonwealth's argument that Appellant's sufficiency argument was waived because she did not identify the specific elements that she was challenging in her concise statement of errors filed pursuant to Rule of Appellate Procedure 1925(b). This Court has repeatedly held that "[i]n order to preserve a challenge to the sufficiency of the evidence on appeal, an appellant's [Rule] 1925(b) statement must state with specificity the element or elements upon which the appellant alleges that the evidence was insufficient." ***Commonwealth v. Ellison***, 213 A.3d 312, 320-21 (Pa. Super. 2019) (quoting ***Commonwealth v. Stiles***, 143 A.3d 968, 982 (Pa. Super. 2016)); ***see also*** Pa.R.A.P. 1925(b)(4)(ii) ("The Statement shall concisely identify each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the judge."). "Such specificity is of particular

importance in cases where, as here, [the appellant] was convicted of multiple crimes each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt." *Ellison*, 213 A.3d at 321 (citation omitted). Where the appellant's Rule 1925(b) statement "does not specify the allegedly unproven elements[,] . . . the sufficiency issue is waived [on appeal]." *Commonwealth v. Tyack*, 128 A.3d 254, 260 (Pa. Super. 2015) (quoting *Commonwealth v. Williams*, 959 A.2d 1252, 1257 (Pa. Super. 2008)); *see also Ellison*, 213 A.3d at 321.

In this matter, Appellant's Rule 1925(b) statement included the following sufficiency challenge: "Did the Trial Court err in ruling that the evidence was sufficient to support the verdicts for Third Degree Murder, Drug Delivery Resulting in Death, PWID/Delivery, as well as Conspiracy to Commit Third Degree Murder, Drug Delivery Resulting in Death and PWID/Deliver?" Rule 1925(b) Statement, ¶1. Appellant did not identify any of the elements of the six offenses for which she was convicted that she sought to challenge on appeal. Appellant previously did raise the specific sufficiency arguments she argues in this appeal in her post-sentence motion, which the trial court addressed in its opinion denying this motion; however, it is "of no moment to our analysis" that Appellant previously addressed these issues to the trial court because we apply Rule 1925(b) "in a predictable, uniform fashion" and therefore we will find waiver where appropriate "despite the presence of a trial court opinion" addressing the sufficiency claims. *Tyack*, 128 A.3d at 261 (citation omitted). Accordingly, because Appellant did not identify any of the

specific elements as to which she claims the evidence was insufficient, Appellant's first appellate issue is waived. **Ellison**, 213 A.3d at 321; **Tyack**, 128 A.3d at 260.[3]

Even if Appellant had not waived her sufficiency of the evidence arguments, we would find them to be without merit.

> When reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. As an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

**Commonwealth v. Hill**, 210 A.3d 1104, 1112 (Pa. Super. 2019) (internal citations, quotation marks, and brackets omitted).

---

[3] In **Commonwealth v. Laboy**, 936 A.2d 1058 (Pa. 2007) (*per curiam*), our Supreme Court held that waiver is not always required in cases where the appellant's Rule 1925(b) statement does not identify the elements as to which the appellant contends the evidence was insufficient. Specifically, the court held that waiver was inappropriate because the case on appeal involved a "relatively straightforward drug case," with an "evidentiary presentation span[ning] a mere thirty pages of transcript," and the trial court "readily apprehended" the appellant's sufficiency challenge. **Id.** at 1060. Here, by contrast, Appellant was convicted of six different offenses, the trial took place over five days with numerous witnesses, and the trial transcript spans more than 1,000 pages. Therefore, we find the application of **Laboy** inapt in the present case to excuse Appellant's deficient Rule 1925(b) statement.

Appellant first argues that the Commonwealth did not present sufficient evidence to establish the malice aforethought element of the murder of the third degree and drug delivery resulting in death charges. "Murder in the third degree is an unlawful killing with malice but without the specific intent to kill." ***Commonwealth v. Dunphy***, 20 A.3d 1215, 1219 (Pa. Super. 2011). At the time of the events at issue here, drug delivery resulting in death was defined as a type of murder of the third degree and therefore the Commonwealth was required to prove that the defendant acted with malice in causing the victim's death. ***See*** 18 Pa.C.S. § 2506(a) (prior version); ***Commonwealth v. Ludwig***, 874 A.2d 623, 631 (Pa. 2005).[4]

Our Supreme Court has defined malice as follows:

> Malice is a legal term, implying much more [than ill-will, a spite, or a grudge]. It comprehends not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured. . . .
>
> [M]alice is present under circumstances where a defendant did not have an intent to kill, but nevertheless displayed a conscious disregard for an unjustified and extremely high risk that his actions might cause death or serious bodily harm.

---

[4] Section 2506 of the Crimes Code, which sets forth the offense of drug delivery resulting in death, was amended in 2011 to define the offense as a felony of the first degree rather than as a type of murder. ***Commonwealth v. Peck***, 202 A.3d 739, 744 n.5 (Pa. Super. 2019). "Therefore, under the present version of Section 2506, the Commonwealth must demonstrate that a defendant was at least 'reckless' as to the death caused by the use of an illicitly delivered drug." ***Id.***

- 10 -

*Commonwealth v. Packer*, 168 A.3d 161, 168 (Pa. 2017) (internal citations and quotation marks omitted). Malice can be inferred from all of the circumstances surrounding the defendant's conduct, which must be such that "one could reasonably anticipate death or serious bodily injury would likely and logically result." *Commonwealth v. Akhmedov*, 216 A.3d 307, 322 (Pa. Super. 2019).

The Commonwealth presented sufficient evidence to show that Appellant acted with malice related to the victim's death. The evidence showed that Appellant was aware that the victim had just been released from prison and was narcotics-naive and that the heroin Appellant and Wentz purchased in Baltimore was of good quality. Upon returning to Pennsylvania, Appellant injected the victim with the heroin and watched him as he began to exhibit signs of an overdose when he began to convulse and his lips and his lips turned blue. Though Appellant and Wentz discussed calling for medical assistance while Appellant was still at Wentz's residence, Appellant left Wentz with the victim and sold or stashed the remainder of the heroin in an effort to distance herself from the victim. Between 10:53 pm and 4:40 am, Appellant and Wentz exchanged more than 12 telephone calls, yet Appellant did not call for medical assistance. During this time, the victim suffered from a slow, hours-long overdose death that could have been halted if medical personnel had been called and the anti-overdose drug Narcan had been administered. N.T., 5/16/18, at 517-18. Finally, upon Appellant's return to Wentz's house,

she acted as if she had not been there the night before and expressed no remorse.

Appellant's actions in injecting the victim with heroin, watching him begin to overdose, and then doing nothing for the victim while concealing her involvement in his drug use showed the hardness of heart, and disregard of social duty characteristic of the mental state of malice. **Packer**, 168 A.3d at 168; **cf. Commonwealth v. Windslowe**, 158 A.3d 698, 710 (Pa. Super. 2017) (holding that Commonwealth proved malice element of murder in the third degree prosecution where defendant performed cosmetic procedure on a patient with industrial-grade silicone inappropriate for the procedure and then failed to call for emergency care when the patient began to exhibit ill effects from the treatment). Furthermore, it is clear that Appellant's actions in providing heroin to the victim and then not seeking medical care for him created "an unjustified and extremely high risk that [her] actions might cause death or serious bodily harm." **Packer**, 168 A.3d at 168. As this Court has explained, heroin has a "high potential for abuse," its dangers "are legendary and known on a widespread basis," and each use of heroin brings "the all too real possibility of death" through overdose. **Minnesota Fire and Casualty Co. v. Greenfield**, 805 A.2d 622, 627 (Pa. Super. 2002), *aff'd on other*

*grounds,* 855 A.2d 854 (Pa. 2004); ***see also Commonwealth v. Kakhankham***, 132 A.3d 986, 995-96 (Pa. Super. 2015).[5]

Appellant next argues that the Commonwealth failed to prove the causation element of the murder of the third degree and drug delivery resulting in death charges. To establish criminal causation, "the Commonwealth must prove that the defendant's conduct was so directly and substantially linked to the actual result as to give rise to the imposition of criminal liability." ***Commonwealth v. Leaner***, 202 A.3d 749, 768 (Pa. Super. 2019) (citation omitted). In ***Commonwealth v. Rementer***, 598 A.2d 1300 (Pa. Super. 1991), a murder of the third degree case, this Court set forth a two-part test for showing a causal relationship a defendant's acts and a victim's death:

> First, the defendant's conduct must be an antecedent, but for which the result in question would not have occurred. A victim's death cannot be entirely attributable to other factors; rather, there must exist a causal connection between the conduct and the result of conduct; and causal connection requires something more than mere coincidence as to time and place. Second, the results of the defendant's actions cannot be so extraordinarily remote or attenuated that it would be unfair to hold the defendant criminally responsible.
>
> As to the first part of the test, the defendant's conduct need not be the only cause of the victim's death in order to establish a causal connection. Criminal responsibility may be properly

---

[5] While ***Kakhankham*** concerns events occurring after the General Assembly amended the drug delivery resulting in death statute to reduce the *mens rea* element to a recklessness standard, 132 A.3d at 994-95, this Court's holding is nevertheless relevant to our consideration of the foreseeability and causation of death resulting from heroin use.

assessed against an individual whose conduct was a direct and substantial factor in producing the death even though other factors combined with that conduct to achieve the result. The second part of the test is satisfied when the victim's death is the natural or foreseeable consequence of the defendant's actions. Where the fatal result was an unnatural or obscure consequence of the defendant's actions, justice would prevent us from allowing the result to have an impact upon a finding of the defendant's guilt.

*Leaner*, 202 A.3d at 768-69 (internal citations and quotation marks omitted);

*see also Kakhankham*, 132 A.3d at 993 (stating that two-part causation test set forth in *Rementer* is applicable in drug delivery resulting in death cases).

In this case, the Commonwealth presented ample evidence to show that Appellant caused the victim's death. With respect to the first part of the causation test, the Commonwealth showed that Appellant's actions were an antecedent to the victim's death because she traveled to Baltimore to purchase heroin with Wentz, and then, upon their return to Pennsylvania, Appellant injected the heroin into the victim's arm. Furthermore, the Commonwealth's medical expert testimony demonstrated that the victim's death was a result of respiratory depression that followed from his ingestion of heroin. Appellant's involvement in the purchase of the heroin, the delivery of the drug to the victim, and her injection of the heroin into the victim's arm likewise satisfies the second part of the causation test. This Court has explained that, in cases where the defendant provides the victim with the heroin that was led to a fatal heroin overdose, the victim's death is the "natural or foreseeable consequence" of the defendant's conduct. *See Kakhankham*, 132 A.3d at 995 (holding that the Commonwealth had satisfied both parts of

the causation test in a drug delivery resulting in death prosecution where the defendant provided heroin to the victim, the victim died of an overdose, and used packets of the heroin supplied by the defendant were found next to the victim's body). In addition to her role in providing the heroin to the victim, the victim's death was particularly foreseeable to Appellant because she was aware that the victim was narcotics-naive upon his release from prison, that the heroin was high quality, and that the victim began to exhibit symptoms of an overdose after his ingestion of the heroin.

Appellant argues that the causation element was not satisfied because Commonwealth did not present sufficient evidence to prove that the victim did not die of Wolff-Parkinson-White Syndrome, a heart condition the victim suffered from, which Appellant's medical expert, Dr. Larence Guzzardi, testified could not be ruled out as the cause of the victim's death. N.T., 5/16/18, at 632-36. We note that the Commonwealth was not required to present evidence to "preclude every possibility of [Appellant's] innocence," and that the jury had the sole responsibility determine the weight and credibility to be afforded to the evidence Appellant presented regarding this condition. *Hill*, 210 A.3d at 1112 (citation omitted). Nevertheless, Dr. Ross, the Commonwealth's forensic pathology expert, testified that the victim had been treated and cured of Wolff-Parkinson-White Syndrome, and any death from this condition would have occurred through sudden cardiac arrest, rather than the slow respiratory failure that occurred here. N.T., 5/15/18, at 503-04, 555-56, 566-67, 578.

Appellant next argues that the evidence was insufficient to show that she delivered heroin to the victim as required for the drug delivery resulting in death and delivery of a controlled substance offenses. Under the Controlled Substance, Drug, Device and Cosmetic Act, delivery is defined as "the actual, constructive, or attempted transfer from one person to another of a controlled substance . . . whether or not there is an agency relationship." 35 P.S. § 780-102(b). "A defendant actually transfers drugs whenever he physically conveys drugs to another person." *Ellison*, 213 A.3d at 319 (quoting *Commonwealth v. Murphy*, 844 A.2d 1228, 1234 (Pa. 2004)). An exchange of money is not required to find that a delivery of a controlled substance occurred. *Id.*

At the time that the events at issue in this case occurred, drug delivery resulting in death was defined as follows:

> A person commits murder of the third degree who administers, dispenses, delivers, gives, prescribes, sells or distributes any controlled substance or counterfeit controlled substance in violation of section 13(a)(14) or (30) of . . . The Controlled Substance, Drug, Device and Cosmetic Act, and another person dies as a result of using the substance.

18 Pa.C.S. § 2506(a) (prior version). Accordingly, under this statute, a defendant can be convicted of drug delivery resulting in death if she delivered a controlled substance as prohibited by the Controlled Substance, Drug, Device and Cosmetic Act, and the additional element is present that another

- 16 -

person died as a result of using that controlled substance.[6]  *Id.*; *see also*

***Commonwealth v. Reese***, No. 140 MDA 2019, unpublished memorandum

at 8-10 (Pa. Super. filed Nov. 27, 2019) (holding that, under the substantially

similar current version of the drug delivery resulting in death statute, delivery

of a controlled substances is a lesser included offense of drug delivery

resulting in death and therefore such convictions should merge for sentencing

purposes).[7]

The Commonwealth here presented sufficient evidence to show that

Appellant was an accomplice to Wentz's delivery of heroin to the victim.  An

individual may face liability as an accomplice to the commission of a criminal

offense when "with the intent of promoting or facilitating the commission of

the offense, he . . . solicits such other person to commit it; or . . . aids or

agrees or attempts to aid such other person in planning or committing it."  18

Pa.C.S. § 306(c)(1).  The Commonwealth demonstrated that, after Appellant,

Wentz, and the victim collected money to purchase drugs, Appellant then

drove Wentz to Baltimore where Wentz purchased three grams of heroin, a

controlled substance.  Appellant and Wentz then drove back to Hanover where

---

[6] Appellant's drug delivery resulting in death conviction could not be premised upon a violation of Section 13(a)(14) of the Controlled Substance, Drug, Device and Cosmetic Act, 35 P.S. § 780-113(a)(14), because that provision applies only to the "administration, dispensing, delivery, gift or prescription of any controlled substance **by any practitioner or professional assistant** under the practitioner's direction and supervision."  *Id.* (emphasis added).

[7] Though an unreported decision, we cite to ***Reese*** for its persuasive value. ***See*** Pa.R.A.P. 126(b) (non-precedential Superior Court decisions filed after May 1, 2019 may be cited for their persuasive value).

the victim was waiting, and Wentz divided the heroin and gave the victim his share of the heroin. This evidence clearly shows that Wentz purchased heroin in Baltimore and conveyed it to the victim, and that Appellant aided in the delivery of the heroin by driving Wentz to Baltimore and back with the intention of facilitating the drug purchase. It is irrelevant to our analysis that neither Appellant nor Wentz profited from the conveyance of heroin to the victim because the exchange of money is not a prerequisite to the delivery of a controlled substance. *Ellison*, 213 A.3d at 319.[8]

Appellant's final challenge to the sufficiency of the evidence relates to her convictions for conspiracy to commit the delivery of a controlled substance, conspiracy to commit drug delivery resulting in death, and conspiracy to commit murder of the third degree. Appellant argues that there was no evidence of an agreement between Appellant and Wentz to commit any of the conspiracy offenses, but rather that the true criminal agreement existed between Wentz and the victim, who contributed to the purchase of the drugs and then received the drugs from Wentz and prepared his own fatal dosage.

To sustain a conviction for criminal conspiracy, "the Commonwealth must establish that the defendant (1) entered into an agreement to commit

---

[8] The Commonwealth argues that it also proved that Appellant "delivered" heroin to the victim by injecting the heroin into his arm. As we conclude that there was sufficient evidence to show that Appellant satisfied the delivery element as an accomplice to Wentz, we need not reach this alternative argument.

or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and, (3) an overt act was done in furtherance of the conspiracy." ***Commonwealth v. Fisher***, 80 A.3d 1186, 1190 (Pa. 2013) (citation omitted).

> An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities. Thus, a conspiracy may be inferred where it is demonstrated that the relation, conduct, or circumstances of the parties, and the overt acts of the co-conspirators sufficiently prove the formation of a criminal confederation. The conduct of the parties and the circumstances surrounding their conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt. Even if the conspirator did not act as a principal in committing the underlying crime, he is still criminally liable for the actions of his co-conspirators taken in furtherance of the conspiracy.

***Commonwealth v. Johnson***, 180 A.3d 474, 479 (Pa. Super. 2018) (citation omitted).

In the instant case, the Commonwealth demonstrated that Appellant and Wentz collected money to purchase heroin, traveled to Baltimore together, purchased heroin, and then returned to Hanover and conveyed the heroin to the victim for his use. After Appellant injected the victim, Appellant and Wentz observed the victim exhibiting signs of an overdose. Appellant and Wentz discussed calling 911 at that time but did not do so; instead, they decided that Appellant would leave Wentz's house with the heroin in order to conceal their involvement with the victim's drug use. Appellant followed through on this plan by selling some of the heroin and hiding the remainder.

After Appellant left, Wentz expressed his worries that the victim was overdosing in telephone conversations with another friend and placed phone calls and sent a text to the victim's phone in an effort to create the appearance that they were not in fact at the same location. In addition, between 10:53 pm and 4:40 am, Appellant and Wentz exchanged more than a dozen telephone calls; while the contents of these conversations is not known, the jury was entitled to infer that these discussions related to the victim's condition and the question of how to keep themselves distanced from the victim's situation. **Johnson**, 180 A.3d at 479. Finally, at 4:42 am Wentz called 911 to report that the victim stopped breathing; Appellant then arrived back at Wentz's house shortly afterwards acting as if she had not been there the prior evening and was unfamiliar with the victim's condition.

Viewing the evidence admitted at trial in the light most favorable to the Commonwealth as verdict winner, **Hill**, 210 A.3d at 1112, the Commonwealth established that Appellant agreed with Wentz to deliver heroin to the victim and then, after they were aware that Wentz was overdosing, Appellant and Wentz decided to conceal their involvement in the victim's drug use rather than call for emergency aid. This evidence was more than sufficient to show that Appellant and Wentz had entered a criminal agreement, whether explicit or implicit, to deliver heroin to the victim and then engage in a course of conduct that deprived the victim of urgently needed medical care to address his heroin overdose, leading to the victim's death. Accordingly, we find

Appellant's sufficiency claims with respect to the conspiracy offenses to be without merit.

### *Weight of the Evidence*

In her second appellate issue, Appellant argues that her convictions were against the weight of the evidence. When considering challenges to the weight of the evidence, our standard of review is as follows.

> The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none or some of the evidence and to determine the credibility of witnesses. Resolving contradictory testimony and questions of credibility are matters for the factfinder. It is well-settled that we cannot substitute our judgment for that of the trier of fact.
>
> Moreover, when a trial court finds that the [verdict] is not against the weight of the evidence, we must give the gravest consideration to the trial court's conclusion because it is the trial court, and not the appellate court, that had the opportunity to see and hear the evidence presented. Furthermore, a defendant will only prevail on a challenge to the weight of the evidence when the evidence is so tenuous, vague and uncertain that the verdict shocks the conscience of the court.

*Commonwealth v. Cramer*, 195 A.3d 594, 600-01 (Pa. Super. 2018) (internal citations and quotation marks omitted). The trial court addressed Appellant's weight of the evidence argument in its memorandum order denying her post-sentence motion, concluding that the jury's guilty verdict on all counts was consistent with the direct and circumstantial evidence presented at trial and did not shock the conscience of the court. Memorandum Order, 12/31/18, at 20.

In this appeal, Appellant appears to challenge the weight of the evidence regarding each of the six crimes for which she was convicted. However, the section of Appellant's brief devoted to this claim largely cross-references and repeats arguments set forth separately in her brief related to the sufficiency of the evidence, her challenge to the trial court's jury instruction regarding malice, and her claim that the trial court abused its discretion in not permitting evidence regarding the victim's prior expression of suicidal thoughts. Appellant's Brief at 30-31. To the extent Appellant does present an argument regarding the weight of the evidence, it is limited to the assertion that "[t]he evidence was undisputed that Wentz was the principal actor in the delivery of the drugs to the victim," the victim prepared his own dosage of heroin, and that Appellant "was no more than present at the scene" during the victim's drug use and ensuing events. *Id.* Appellant, however, has not developed these arguments any further nor has she cited to any portions of the record that allegedly support her claims. Furthermore, Appellant only cites to two Supreme Court decisions to support her argument, *Ludwig* and *Commonwealth v. Chambers*, 188 A.3d 400 (Pa. 2018), and both of these cases address sufficiency, not weight, of the evidence claims. In light of Appellant's failure to adequately develop her argument, we therefore find that this argument is waived. *See Wirth v. Commonwealth*, 95 A.3d 822, 837 (Pa. 2014) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." (citation

omitted)); ***Milby v. Pote***, 189 A.3d 1065, 1079 (Pa. Super. 2018) ("The failure to develop an adequate argument in an appellate brief may [] result in waiver of the claim under Pa.R.A.P. 2119." (citation and internal quotation marks omitted)).

To the extent we would address Appellant's weight of the evidence claim, we note that appellate review of this issue is

> extremely limited and is confined to whether the trial court abused its discretion in finding that the jury verdict did not shock one's conscience. Thus, appellate review of a weight claim consists of a review of the trial court's exercise of discretion, not a review of the underlying question of whether the verdict is against the weight of the evidence.

***Commonwealth v. Rosser***, 135 A.3d 1077, 1090 (Pa. Super. 2016) (*en banc*) (citation omitted).

Upon review, we do not conclude that trial court abused its discretion in finding that the jury's verdict did not shock the conscience. While Appellant argues that Wentz was the "principal actor" in the delivery of heroin to the victim, Appellant's Brief at 30, as discussed *supra*, Appellant was charged as a principal and an accomplice with respect to the delivery of a controlled substance and drug delivery resulting in death charges and ample evidence was before the jury that Appellant actively aided Wentz in purchasing the heroin and delivering it to the victim. Furthermore, Appellant's contention that she was "no more than present at the scene," ***id.*** at 31, is belied by Lambertson's testimony that Appellant attempted to distance herself from the events after the victim began to overdose and Wentz's testimony that he

asked her to get rid of the heroin after the victim began to overdose. Appellant's argument in this regard is little more than a claim that this Court should reject the testimony of Commonwealth witnesses such as Lambertson in favor of the testimony of defense witnesses, an argument that would require this Court to exceed its appellate role and override the jury's resolution of contradictory evidence and questions of credibility. *Cramer*, 195 A.3d at 600. Because Appellant has failed to establish the trial court abused its discretion in denying her weight of the evidence claim, her second issue fails.

*Trial Court Examination of Medical Expert*

In her third issue, Appellant contends that the trial court improperly asked questions of Deputy Coroner Stabley regarding the victim's toxicology report when Stabley had not been qualified as an expert in toxicology. During re-cross-examination, defense counsel asked a series of questions regarding the metabolization of heroin, the levels of opiates reported in Appellant's system in the toxicology report, and the therapeutic range of morphine when medically prescribed that was stated on the toxicology report. N.T., 5/15/18, at 302-03. The trial judge then stated that he was "confused" and asked several more questions regarding the relevance of the therapeutic range of morphine to the evaluation of the toxicology report and the determination of the cause of the victim's death. *Id.* at 304, 307-09. Stabley explained that examining only the level of morphine in the blood did not provide a complete picture of what happened, but by looking at the levels of morphine and the heroin metabolite 6-monoacetylmorphine in the blood and urine, he was able

- 24 -

to determine that the victim had ingested a large amount of heroin that was being metabolized and excreted out of the body when he died. *Id.* Defense counsel lodged an objection to the judge's line of questioning, which the trial court overruled, explaining that defense counsel had "opened the door" through his previous line of questioning and that he was "truly confused" by Stabley's responses and "maybe some jurors . . . are also confused." *Id.* at 305-07.

We review a trial court's evidentiary rulings on an abuse of discretion standard. *Commonwealth v. Fitzpatrick*, 204 A.3d 527, 531 (Pa. Super. 2019). An abuse of discretion will be found where "the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by evidence of record." *Id.* (citation omitted).

Pursuant to the Pennsylvania Rules of Evidence, the trial court may examine a witness called by any party "[w]here the interest of justice so requires." Pa.R.E. 614(b). "While a trial judge should normally leave questioning of witnesses to counsel, justice may require that a trial judge ask questions when absurd, ambiguous, or frivolous testimony is given or testimony is in need of further elucidation." *Commonwealth v. Carson*, 913 A.2d 220, 249 (Pa. 2006). "[W]here an important fact is indefinite or a disputed point needs to be clarified, the court may see that it is done by taking part in the examination[.]" *Commonwealth v. Roldan*, 572 A.2d 1214, 1215 (Pa. 1990) (citation omitted). "[A] new trial is required . . . only when

the trial court's questioning is prejudicial, that is when it is of such nature or substance or delivered in such a manner that it may reasonably be said to have deprived the defendant of a fair and impartial trial." ***Commonwealth v. Manuel***, 844 A.2d 1, 9 (Pa. Super. 2004) (citation omitted).

We discern no abuse of discretion by the trial court in the questions it posed to Stabley. Initially, we note that Stabley was qualified as an expert in the field of determining the cause and manner of death, N.T., 5/15/18, at 253-58, and therefore he was capable of testifying regarding the influence that the toxicology reports, including the levels of heroin metabolites reflected on that report, had on his determination of the cause and the manner of the victim's death. Stabley had previously testified that he did not issue the death certificate with a cause of death until July 26, 2010 when he received and reviewed the toxicology report. ***Id.*** at 298.

To the extent the trial court's questions exceeded Stabley's expertise, Appellant cannot complain because her counsel's own questions on cross-examination and re-cross-examination "open[ed] the door" to the trial court's interrogation of Stabley. ***See Commonwealth v. Harris***, 884 A.2d 920, 928 (Pa. Super. 2005) (when defendant "delves into what would be objectionable testimony" during the examination of a witness, "then the Commonwealth can probe further into the objectionable area" (citation omitted)).[9] During cross-

_____

[9] Though the reference in ***Harris*** to "opening the door" to areas of testimony that would otherwise be forbidden by the defense relates to the prosecution's

examination, defense counsel asked several questions regarding the therapeutic range for morphine and the actual levels of morphine in the victim's blood as reflected on the toxicology report, N.T., 5/15/18, at 288-91, and then on re-cross-examination, defense counsel revisited these topics. *Id.* at 302-03. The trial court acted well within its discretion in determining that the questions posed to Stabley regarding the toxicology report required clarification and interrogating the witness further with the goal of resolving the confusion. *Carson*, 913 A.2d at 249; *Roldan*, 572 A.2d at 1215.

### *Admissibility of the Victim's Prior Suicidal Thoughts*

Next, Appellant challenges the trial court's determination that she was not permitted to cross examine Dr. Ross, the Commonwealth's forensic pathology expert, regarding the victim's previous expression of suicidal thoughts that were reflected in his medical records. During the testimony of Dr. Ross, defense counsel sought to ask the witness questions regarding two incidents, the first occurring in May 2001 and the second in May 2008, in which Appellant verbally discussed or threatened to commit suicide and mental health checks were performed. N.T., 5/16/18, at 544, 549-50. The Commonwealth objected, and the trial court sustained the objection, concluding that the defense could not raise the issue of suicidal thoughts or attempts without further corroborating evidence. *Id.* at 544-48, 549-51. In

---

ability to delve into the same topics, we see this doctrine as equally applicable in the context of a trial court following up on a party's interrogation of a witness.

its memorandum order denying Appellant's post-sentence motion, the trial court further explained that the 2001 and 2008 medical records showing the victim's suicidal thoughts were too remote from his death to be relevant to the question of how he died.  Memorandum Order, 12/31/18, at 33.

Appellant contends that the circumstances of the victim's death were consistent with suicide, as the victim was an experienced heroin user, knew that he was narcotics-naive after his release from incarceration, knew that the heroin Wentz had purchased was of high quality, and prepared his own dosage.  In light of the fact that the circumstances lend themselves to a finding that the victim committed suicide by overdose, Appellant contends that the trial court's refusal to let Appellant inquire into the victim's suicide threats solely based on the remoteness in time of the threats was an abuse of discretion.

However, as Appellant recognizes in her brief, our Supreme Court has stated that previous threats or attempts of suicide may be relevant to show that a decedent's death was at his own hands, when two requirements are satisfied:  first, the circumstances of death were as consistent with suicide as with homicide, and, second, the suicide threats or attempts were made within a reasonable time before death.  **See Commonwealth v. Donough**, 103 A.2d 694, 699 (Pa. 1954); **Commonwealth v. Santos**, 119 A. 596, 598-99 (Pa. 1923); **see also Commonwealth v. Hess**, 548 A.2d 582, 585 (Pa. Super. 1988) (statements relevant to a declarant's state of mind "may be

inadmissible if they were made at a time so remote from the incident to which they purportedly pertain that their probative value is *de minimus*").

As set forth above, one of the incidents of a suicide threat occurred more than two years prior to the victim's death, while the other incident occurred more than nine years prior to his death. We cannot say that the trial court's determination that these incidents were "too remote in time" to be relevant to the issue of whether Appellant committed suicide was an abuse of discretion. **Donough**, 103 A.2d at 699; **cf. id.** at 699-700 (threat of suicide by the deceased in the minutes prior to a death may be relevant if reasonably connected to the circumstances of the death); **Santos**, 119 A. at 598-99 (threat of suicide within three weeks of the victim's death was not too remote in time to warrant exclusion from the evidence).

*Malice Jury Instruction*

In her fifth issue, Appellant challenges the trial court's instruction to the jury with respect to the murder of the third degree and drug delivery resulting in death charges that "[m]alice can be inferred from the failure of the Defendant to seek medical care for the victim." N.T., 5/18/18, at 1136-37. Appellant contends that this instruction erroneously stated the law because it imposed a non-existent duty of care on her in a case where the victim willingly ingested the heroin that lead to his death. Appellant distinguishes the present matter from cases in which courts have found that malice could be inferred from the failure to provide medical care, noting that in those cases the defendants had used a deadly weapon on a vital part of the victim's body and

then abandoned the victim without attempting to obtain medical care. *See Commonwealth v. Boyd*, 334 A.2d 610, 613-14 (Pa. 1975); *Commonwealth v. Lee*, 626 A.2d 1238, 1239, 1242 & n.4 (Pa. Super. 1993).

We review jury instructions to determine whether the trial court committed an abuse of discretion or an error of law. *Commonwealth v. Soto*, 202 A.3d 80, 98 (Pa. Super. 2018). We must "look to the instructions as a whole, and not simply isolated portions, to determine if the instructions were improper." *Commonwealth v. Sandusky*, 203 A.3d 1033, 1098 (Pa. Super. 2019) (citation omitted). The trial court has broad discretion and may choose its own words in fashioning jury instructions. *Soto*, 202 A.3d at 98. "Our key inquiry is whether the instruction on a particular issue adequately, accurately and clearly presents the law to the jury, and is sufficient to guide the jury in its deliberations." *Id.* (citation omitted).

Here, the trial court instructed the jury regarding the malice element of the drug delivery resulting in death charge as follows:

> Here is what malice means in this context. A Defendant's actions are made with malice if they show his or her wanton and willful disregard of an unjustified and extremely high risk that his or her conduct would result in death or serious bodily injury to another.
>
> The Commonwealth need not prove that the Defendant specifically intended to kill another. But it must prove beyond a reasonable doubt that the Defendant took action while conscientiously; that is, knowingly disregarding the most serious risk that he or she was creating. And that by his or her disregard of that risk, he or she demonstrated an extreme indifference to the value of human life.
>
> **Malice can be inferred from the failure of the Defendant to seek medical care for the victim.**

- 30 -

N.T., 5/18/18, at 1135-36 (emphasis added). The trial court then gave the following instruction on malice as part of the murder of the third degree charge:

> The word malice as I'm using it has a special legal meaning. It does not mean simply hatred, spite, or ill will. Malice is a shorthand way of referring to a particular mental state that the law regards as being bad enough to make a killing murder.
>
> For murder of the third degree, a killing is with malice if the perpetrator's actions show his or her wanton and willful disregard of an unjustified and extremely high risk that his or her conduct would result in death or serious bodily injury to another. In this form of malice, the Commonwealth need not prove that the perpetrator specifically intended to kill another person. The Commonwealth must prove, however, that the perpetrator took action while conscientiously; that is, knowingly disregarding the most serious risk that he or she was creating. And that by his or her disregard of that risk, the perpetrator demonstrates his or her extreme indifference to the value of human life.
>
> When deciding whether the Defendant acted with malice, you should consider all of the evidence regarding her words, conduct, and the attending circumstances that may show her state of mind. **Malice can be inferred from the failure of the Defendant to seek medical care for the victim.**

*Id.* at 1136-37 (emphasis added). Appellant lodged an objection to the instruction that malice can be inferred from the failure to seek medical care, which the trial court overruled. *Id.* at 1158-59.

Viewing the instructions as a whole, we conclude that the trial court accurately and clearly described to the jury the law regarding malice. *Sandusky*, 203 A.3d 1033, 1098; *Soto*, 202 A.3d at 98. The trial court's statement that malice can be inferred from the failure to provide medical care is well-established in our case law. In *Boyd*, our Supreme Court held that,

where the defendant shot the victim unintentionally during a fight at a gambling house and then moved the bleeding victim to his car and left him there, "the court could infer malice from [the defendant's] failure to attempt to obtain aid for the wounded man." 334 A.2d at 614. In **Lee**, the defendant shot the victim in the face from close range and did not attempt to obtain immediate medical attention for the victim; citing **Boyd**, this Court stated that "[m]alice can be inferred in a homicide prosecution from the failure of the defendant to seek medical care for the victim." **Lee**, 626 A.2d at 1242 n.4. The trial court repeated this statement of the law nearly verbatim in its instruction. Finally, we observe that the trial court's instruction regarding the inference of malice from the failure to provide medical care did not appear in isolation, but rather this instruction followed an accurate recitation of the malice standard as set forth in our case law. **See, e.g., Packer**, 168 A.3d at 168. Accordingly, Appellant's fifth appellate issue warrants no relief.

### Bad Act Evidence

Finally, Appellant argues that the trial court abused its discretion by allowing the Commonwealth to admit other bad acts evidence related to Appellant making two sales of heroin after she left Wentz's residence on the night of July 19, 2010. Appellant contends that the Commonwealth's proffered use for this evidence to show Appellant's state of mind is not set forth in the list of authorized uses for other bad act evidence under Pennsylvania Rule of Evidence 404(b)(2) and in fact this evidence was used to show Appellant's propensity to commit crime, which is forbidden under Rule 404(b)(1).

- 32 -

Appellant argues that the other bad act evidence was highly prejudicial because it showed that she was selling drugs while the victim was dying of an overdose and such prejudice outweighed any limited probative value that it had. Appellant further claims that she was not provided with reasonable notice of the fact that this information would be admitted in advance of trial as required by Rule 404(b)(3).

Rule 404(b) provides as follows:

**(b) Crimes, Wrongs or Other Acts.**

*(1) Prohibited Uses.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

*(2) Permitted Uses.* This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

*(3) Notice in a Criminal Case.* In a criminal case the prosecutor must provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence the prosecutor intends to introduce at trial.

Pa.R.E. 404(b).

This Court has explained that:

In accordance with Rule 404(b)(1), evidence of prior bad acts or criminal activity unrelated to the crimes at issue is generally inadmissible to show that a defendant acted in conformity with those past acts or to show criminal propensity. However, it is well settled that evidence of prior bad acts may be admissible when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident. In determining whether evidence

of other prior bad acts is admissible, the trial court is obliged to balance the probative value of such evidence against its prejudicial impact.

***Commonwealth v. Conte***, 198 A.3d 1169, 1180 (Pa. Super. 2018) (internal citations and quotation marks omitted). With respect to the notice requirement of Rule 404(b)(3),

> [t]he purpose of this rule is to prevent unfair surprise, and to give the defendant reasonable time to prepare an objection to, or ready a rebuttal for, such evidence. However, there is no requirement that the notice must be formally given or be in writing in order for the evidence to be admissible.

***Commonwealth v. Lynch***, 57 A.3d 120, 125-26 (Pa. Super. 2012) (internal citations and quotation marks omitted).

In its memorandum order denying Appellant's post-sentence motion, the trial court concluded that Appellant was provided notice of the bad acts evidence as demonstrated by the fact that she made an oral motion *in limine* at the outset of trial seeking to exclude any reference to her drug deals after she left Wentz's house, which the trial court denied. Memorandum Order, 12/31/18, at 39; N.T., 5/14/18, at 11-20. The court concluded that the bad acts evidence was admissible under Rule 404(b) because it showed Appellant had the "wickedness of disposition" or "hardness of heart" necessary to find that she possessed malice aforethought when she left the victim overdosing at Wentz's house and disposed of the heroin instead of calling 911 or otherwise seeking aid for the victim. Memorandum Order, 12/31/18, at 39. The court explained that the evidence of Appellant's drug sales had little prejudicial effect on Appellant because there was substantial other evidence at trial that

Appellant, Wentz, and the victim were regular users of heroin and involved in transactions for the drug, including the July 19, 2010 purchase in Baltimore. *Id.* at 39-40. Finally, the trial court noted that it provided a limiting instruction to reduce any prejudicial value that the other bad act evidence might have on Appellant. *Id.* at 40.[10]

We agree with the trial court. First, Appellant was clearly on notice regarding the bad acts evidence because the source of the Commonwealth's evidence was Appellant's own statement to police, which the Commonwealth provided Appellant in discovery and the use of which Appellant challenged prior to the commencement of trial. N.T., 5/14/18, at 16-17. Appellant has not demonstrated any unfair surprise or prejudice from the notice provided. *See Lynch*, 57 A.3d at 125-26. Furthermore, Appellant's heroin sales during

_____

[10] The trial court instructed the jury as follows:

> In this case, you have heard evidence tending to prove that the [Appellant] was guilty of improper conduct for which she is not on trial. I am speaking of the testimony to the effect that the [Appellant] used and delivered drugs on other occasions and was subjected to an unrelated arrest.
>
> This evidence was introduced for a limited purpose. That is for the purpose of tending to explain the natural chain and sequence of events[,] tending to show or rebut the [Appellant's] state of mind concerning the crimes charged or tending to show or rebut the voluntariness of the [Appellant's] statements to the police.
>
> This evidence must not be considered by you in any way other than for the purpose I just stated. You must not regard this evidence as showing that the [Appellant] is a person of bad character or criminal tendencies from which you must be inclined to infer her guilt regarding the charges lodged against her in this case.

N.T., 5/18/18, at 1131-32.

the period when the victim was overdosing from heroin at Wentz's house were clearly relevant to show Appellant's extreme indifference to human life and recklessness of consequences characteristic of the state of mind of malice necessary for Appellant's conviction of murder of the third degree and drug delivery resulting in death. **Packer**, 168 A.3d at 168. In addition, Appellant's heroin sales were relevant as *res gestae* evidence to "tell the complete story" of her criminal acts to show what occurred between the time she left Wentz's house on the evening of July 19, 2010 while the victim was overdosing and when Wentz finally called 911 at 4:42 am on July 20th. **See Commonwealth v. Hairston**, 84 A.3d 657, 666 (Pa. 2014) (other bad act evidence "relevant for *res gestae* purposes to explain the history and course of events on" the day of the crime); **Commonwealth v. Brown**, 52 A.3d 320, 332 (Pa. Super. 2012) ("[T]he history of the *res gestae* exception demonstrates that it is properly invoked when the bad acts are part of the same transaction involving the charged crime."). Though not explicitly identified in Rule 404(b)(2), both the issue of the defendant's state of mind demonstrating malice and *res gestae* evidence have been recognized as legitimate purposes for the admission of other bad act evidence. **See Hairston**, 84 A.3d at 666 (*res gestae*); **Akhmedov**, 216 A.3d at 317-19 (malice).

Furthermore, as the trial court explained, Appellant was not unfairly prejudiced by the admission of evidence that she sold heroin to other parties after leaving Wentz's house on July 19, 2010 in light of the substantial evidence before the jury regarding her use of heroin and participation in

transactions involving the drug. "The trial court is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged." *Hairston*, 84 A.3d at 666 (citation and quotation marks omitted). To the extent this evidence could be prejudicial to Appellant, the trial court appropriately instructed the jury regarding the proper considerations of the bad act evidence therefore minimizing any concern that the evidence would inflame the jury or cause it to convict Appellant on an improper basis. *See id.*

Accordingly, Appellant is not entitled to relief on any of the issues raised in this appeal.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/21/2020